EASTERN SEAFOOD COMPANY, INC., Plaintiff-Appellee, v. NICHOLAS BARONE et al., d/b/a Alfredo's, Defendants (Nicholas Barone, Appellant).

First District (2nd Division)   No. 1—92—2859

Opinion filed August 10, 1993.

Burditt & Radzius, Chartered, of Chicago (C.D. Kasson and David M. Rownd, of counsel), for appellant.

Steck & Spataro, of Chicago (Richard E. Steck, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff Eastern Seafood Company, Inc., filed this breach of contract action against defendants Nicholas Barone and unknown owners of a restaurant, Alfredo's, among others, for nonpayment of over $30,000 in seafood deliveries. After a bench trial, the circuit court found defendant Nicholas Barone personally liable for the debt. It held that the liability of another defendant, Innocenzo DeLuliis, and of the restaurant had been discharged in bankruptcy and that other defendants should be dismissed. We affirm.

At trial, Mario Falco, president of plaintiff Eastern Seafood, testified that he took seafood orders from DeLuliis and Barone starting in 1987 or 1988. He did not know defendants Theresa Barone, 9905 West 55th Street, Inc.[1] (9905 West), or First Illinois Bank & Trust. Prior to January 31, 1989, plaintiff was paid by Alfredo's, Inc., and after that was paid by Atron, Inc. (Atron). Plaintiff had not been paid for the deliveries between May 1988 and August 1989, however, so it claimed $30,734.80 in DeLuliis' bankruptcy proceeding. It received only $2,520.20 from the bankruptcy estate. Falco explained how an invoice accompanies each delivery and is signed by the chef or owner at the time of delivery.

James Rubino, former manager of Eastern Seafood, testified that he had done business with Barone since 1982, when Barone ran the restaurant. Payments were timely until the restaurant was remodeled in 1987 or 1988, at which time "[p]ayments got real slow to none." At Barone's direction, he would go to the restaurant on Sunday evenings and collect a check, which often was returned for insufficient funds, or cash from Barone and no one else. Around early 1989, when Eastern Seafood no longer extended credit to the restaurant, Barone told him, "I want to improve my restaurant on the seafoods." He was under the impression that Barone and DeLuliis were partners.

Joseph Maffei, a meat-packing company owner, testified that he had been doing business with Barone for 17 years. During that time,

---

[1]Defendant 9901 West 55th Street, Inc., is the beneficiary of a land trust that owns the building housing the restaurant; defendant Barone or his wife is its principal stockholder.

Barone had a pizzeria and a pizza supply house, and he then was involved with Alfredo's and several other restaurants. Maffei had conducted business with Alfredo's from the time it opened. He understood that DeLuliis and Barone were partners, and no one ever told him that the principals of Alfredo's had changed in any way. He first ran into problems with bill payment when the remodeling occurred. Barone never said he was not paying the bills on the ground that he was not responsible for them. Eventually Maffei stopped doing business with Alfredo's, and like Eastern Seafood, he filed a claim in DeLuliis' bankruptcy proceeding.

Theresa Barone, Barone's wife, explained the history of the site of the restaurant. From approximately 1972 to 1982, the building housed a restaurant known as Barone's of Countryside, which was owned and operated by Barone. In 1982 or so, the restaurant became Alfredo's, and the building was orally leased to DeLuliis and her husband "in some type of partnership." Although at trial she testified that Barone did not work at Alfredo's from 1986 through 1990, in a deposition she had said he had no other employment during that time and "probably" was at the restaurant. Despite her position as secretary of Atron, she did not know what business it did; likewise, she was unfamiliar with the affairs of 9901 West, which she presumed was in the restaurant business. Nevertheless, she verified a number of 9901 West checks from 1988 with Barone's signature and the notation "Alfredo's." She could not say what their purpose was, though some were payable to restaurant vendors and others to the Illinois Departments of Labor and of Revenue. One check was payable to Barone, with the notation "petty cash."

DeLuliis, Barone's ex-brother-in-law and sole stockholder in Alfredo's, Inc., testified that he had been the chef at the restaurant until January 1989. As partners, he and Barone had opened Alfredo's after Barone of Countryside, which Barone had owned, closed. To remodel the restaurant prior to opening as Alfredo's, DeLuliis had invested more than $20,000 and Barone had contributed a smaller sum. Shortly after the second remodeling at Christmas 1987 or 1988, he testified, he decided to leave when Barone told him "I got to take over on my own." At a deposition, however, he had said the takeover occurred when the remodeling loan came through and Barone started pouring the foundation for the restaurant expansion. When Barone began managing the restaurant, 8 to 12 months before DeLuliis left, bills were not paid, and it was Barone's decision not to pay plaintiff. Asked about the restaurant's expenses and receipts, he replied "we take care of some of the bills and the rest Nick Barone took care of."

At Barone's request, Alfredo, Inc., paid Barone's wife as a partner, but Barone was the real partner.

DeLuliis conceded that he had formed Alfredo's, Inc., in 1983 with $25,000 and that he was the sole shareholder. While operating the restaurant, he made mortgage payments on the property and paid the restaurant's operating expenses, such as employees and suppliers from the Alfredo's, Inc., account. Although he had been joined as a defendant in this lawsuit in January 1990, he claimed he was unaware of this when he filed for personal bankruptcy in July 1990 even though his bankruptcy petition listed the same amount for which Eastern Seafood brought this suit. DeLuliis explained that even though his bankruptcy petition had listed Eastern Seafood and a number of other vendors to Alfredo's and had stated that only he owned and operated Alfredo's, Inc., he merely signed the petition at his attorney's direction and did not know what was in it. He also did not know that Eastern Seafood had received anything from his bankruptcy estate. Later, in plaintiff's rebuttal case, DeLuliis testified that Barone "always took whatever he wanted" from the cash register in addition to the mortgage payment. DeLuliis admitted, however, that he himself had done most of the hiring, firing, and ordering.

Barone, testifying as an adverse witness, recounted that he had been in the restaurant business for 25 or 30 years; he had owned perhaps more than 20 restaurants during that time and franchised 10 others. At his deposition, he had explained that when DeLuliis ceased working at the restaurant in January 1989, the restaurant ownership had been "left *** in limbo to see what was [sic] the hell was going on." He testified that he had paid the mortgage on the building since January 1989, but he explained that the reason he had indicated at his deposition that he had been paying it for "a couple of years" prior to the deposition was that he paid it on occasions when Alfredo's could not afford to do so. As for the payments to his wife, he had merely provided consulting services to DeLuliis, for which his wife received $150 a week. He conceded that the restaurant's liquor license had been in the name of Barone of Countryside, but he insisted that he had instructed DeLuliis many times to change it to Alfredo's, Inc.

As their first witness, defendants called Theresa Barone. She explained that her husband had operated a restaurant in La Grange Park, but in 1984, Barone's ex-wife became the owner, so he became unemployed until he ran a restaurant in Bellwood in 1985-86. Barone then began a construction company and developed a piece of property, after which "they" decided to reconstruct the restaurant. Barone then commenced work on another commercial property, which he

worked on until he and DeLuliis had a disagreement and the latter walked out, at which time (January 1989) Barone became active in the restaurant. She further testified that her husband never had said he was in partnership with DeLuliis, and she had seen no document to this effect.

Defendants also called Barone as a witness. After his divorce, he had asked DeLuliis for employment; DeLuliis had replied, "I don't want you here. This is my place. I run the place." He described his subsequent employment as his wife had. Though at DeLuliis' insistence there was no written lease, DeLuliis paid the mortgage payments directly in lieu of rent; when he stopped, Barone could not throw him out because DeLuliis "was" the restaurant and 9901 West, the owner of the building, would have lost even more. When the restaurant began to turn a profit in 1983 or 1984, DeLuliis began to pay Barone's wife $150 a week, which was raised to $400 or so in 1986. In 1987, Barone talked with DeLuliis about expanding the restaurant, and DeLuliis convinced him to make the $700,000 in improvements, in return for which DeLuliis agreed to pay $12,000 per month as rent. Barone recounted that in the fall of 1988, Alfredo's, Inc., was not paying the mortgage on the restaurant, so he paid it "every once in awhile." Similarly, he had paid bills from liquor suppliers and other vendors. When Barone had chided DeLuliis about not paying bills, the latter had replied, "This is my corporation. *** [Y]ou ain't got no right to tell me what to do." Barone eventually realized that he would have to assume full responsibility for the restaurant, so he began to spend three or four days a week there to familiarize himself with its operation. Atron began operating the restaurant on January 31, 1989, and it paid no debts of Alfredo's, Inc., that had accrued prior to that date. Barone denied any involvement in Alfredo's, Inc., as an officer or shareholder, and he further denied that he had been DeLuliis' partner.

In delivering its ruling in plaintiff's favor, the court stated:

"The witnesses produced on the defense's behalf in my opinion were not convincing. The witnesses produced on behalf of the plaintiff, each of them were [sic] in my opinion sincere and convincing as to those aspects which are necessary to decide the issues in this case.

*** I am convinced by a clear preponderance that the plaintiff has proved the necessary elements to have judgment against the defendant, Nicholas Barone."

Judgment in the full amount of the invoices, less the money awarded by the bankruptcy court, was entered against Barone; the other

defendants were dismissed. Barone moved for reconsideration, but the circuit court denied the motion.

## I

The standard of review following a bench trial is well settled:

> "Although a trial court's decision is always subject to review, a reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the trier of fact. [Citations.] The trial judge, as the trier of fact, is in a position superior to a court of review to observe the demeanor of witnesses while testifying, to judge their credibility and to determine the weight their testimony should receive. [Citations.] Consequently, where the testimony is conflicting in a bench trial, the court's findings will not be disturbed unless they are against the manifest weight of the evidence." (*In re Application of the County Treasurer* (1989), 131 Ill. 2d 541, 549, 546 N.E.2d 506, 510.)

With this guidance, we address the merits of Barone's appeal.

## II

Barone first claims that as a matter of law, the bankruptcy court's findings preclude recovery from him. In his petition, Barone explains, DeLuliis listed the debt involved here but did not mention Barone's purported interest in the restaurant. He argues that because plaintiff filed a claim against DeLuliis, it is estopped to assert that Barone is liable instead, citing *Republic Supply Co. v. Shoaf* (5th Cir. 1987), 815 F.2d 1046. In that case, he explains, the bankruptcy court had confirmed a plan releasing a guaranty executed in favor of a creditor, who then received only 40% of the debt. When the creditor subsequently filed a separate action against the guarantor for the remaining 60%, the trial court rejected the guarantor's defense of *res judicata*. The appellate court reversed, however, holding that the defense was available because the bankruptcy court had expressly released the guarantor, so the general rule that discharge of an underlying debt does not release a guarantor was not applicable. Barone also insists that the bankruptcy trustee's final report, adopted as a finding of fact by the bankruptcy court, was that Alfredo's, Inc., owned the restaurant at the relevant time and that DeLuliis was liable for the debt at issue.

■ It is true that the doctrine of *res judicata* will bar parties and their privies from relitigating all claims that were or could have been

brought in the first proceeding, once final judgment on the merits has been entered and the rights of the parties have been determined. (*Spiller v. Continental Tube Co.* (1983), 95 Ill. 2d 423, 432, 447 N.E.2d 834, 838.) In bankruptcy proceedings, however, although the debtor is given a "fresh start," a secondary party who is independently liable for a particular debt, such as an insurer, remains liable, and a creditor may attempt to collect from that third party so long as the debtor is not affected by the outcome of the separate litigation. (*In re Pettibone Corp.* (N.D. Ill. 1991), 134 Bankr. 349, 352-53.) Barone is such a third party, for in Illinois, each partner is jointly and severally liable for the debts of the partnership. (Ill. Rev. Stat. 1987, ch. 106½, par. 15.) This is so even if a third-party creditor is unaware of the partnership arrangement. (*Gardenhire v. Ray* (1939), 302 Ill. App. 268, 275, 23 N.E.2d 927, 930.) In addition, we note, in Illinois, despite the general rule of *res judicata*, partners need not be sued jointly for a partnership debt. (See Ill. Rev. Stat. 1989, ch. 110, par. 2—410 (parties to a joint obligation may be sued separately, and a judgment against fewer than all partners is no bar to an action against those not included in judgment or those not sued).) Thus, *Republic Supply* is readily distinguishable because there the bankruptcy court expressly released the guarantor whereas Barone was not released from liability. Instead, the bankruptcy court merely accepted DeLuliis' admission of liability for the debts. It was not asked to address, and it did not determine, whether anyone other than DeLuliis would be liable for the debt as well.

Implicit in the court's findings on the witnesses' credibility is that it believed that DeLuliis and Barone had a partnership. Accordingly, under Illinois law, plaintiff could collect the debts at issue from Barone because Barone's liability was separately enforceable and the contract litigation would not affect DeLuliis.

### III

Defendant argues that he cannot be held personally liable for the debts because he was acting as an officer of 9901 West and of Atron at all relevant times, as shown by the use of 9901 West checks prior to January 1989 and Atron checks afterward for the restaurant. He insists that he can be held personally liable only if the evidence demonstrated that he disregarded the separation between the legal entities and himself, and he faults plaintiff for not providing evidence of the lack of separation by, for example, disregard of corporate formalities or lack of distinction between his personal affairs and those of the corporations. Barone also insists that the issue is not whether the cir-

cuit court correctly resolved the conflicting testimony but rather whether plaintiff satisfied its burden of establishing that Barone exercised dominion and control over the restaurant either individually rather than in a corporate capacity. The reason 9901 West paid the restaurant's bills and mortgage for the restaurant was in fact to protect that corporation, he explains, for if the restaurant failed, the corporation would suffer. He deems unimportant that the restaurant's liquor license was never changed from Barone's of Countryside's name and put in the name of Alfredo's, Inc.

Piercing the corporate veil of limited liability may occur:

> "where the corporation is merely the alter ego or business conduit of a governing or dominating personality [citation], or 'where the corporation is so organized and controlled, and its affairs so conducted, as to make it a mere instrumentality of another corporation.' [Citation.] ***
>
> For the doctrine to apply, two requirements must be met. First, there must be such a unity of interest and ownership that the separate personalities of the corporation and the dominating individual or entity no longer exist. Second, the facts must be such that an adherence to the fiction of separate corporate existence would endorse a fraud or promote injustice. [Citation.]
>
> The doctrine of 'piercing the corporate veil' is an equitable remedy [citations] ***. The doctrine of alter ego fastens liability on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's personal business." *In re Rehabilitation of Centaur Insurance Co.* (1992), 238 Ill. App. 3d 292, 299-300, 606 N.E.2d 291, 296, *appeal allowed* (1993), 148 Ill. 2d 643, 610 N.E.2d 1264.

■ Here, as noted above, the court explicitly found that plaintiff's witnesses were convincing and that defendants' were not. Plaintiff's witnesses testified to the effect that the operation of the restaurant during the relevant period was at least a partnership (Ill. Rev. Stat. 1987, ch. 106½, par. 6 ("association of two or more persons to carry on as co-owners a business for profit")) between Barone and DeLuliis, if not Barone's sole proprietorship. It is true that corporate funds were used for the restaurant's benefit and that the corporations benefited by the restaurant's paying the mortgage. As the record demonstrates, however, Barone used the restaurant for his personal benefit as well (*e.g.*, taking money from the cash register at will), without regard for the corporations' separate identity. In short, although sole stockholders in close corporations may play an active role

in management of the corporation's affairs, Barone's conduct was inconsistent with the existence of the separate corporate personality required for limited liability, so to adhere to the fiction in this case would promote injustice.

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

McCORMICK, P.J., and HARTMAN, J., concur.